**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X     **Case No.: 1:24-cv-5734**

SHARMIN FARUQUE,

                                        Plaintiff,                                **COMPLAINT**

                    - against -
                                                                          **PLAINTIFF DEMANDS**
                                                                          **A TRIAL BY JURY**

JP MORGAN CHASE & CO.


and

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION
                                        Defendants.
-------------------------------------------------------------------X

        SHARMIN FARUQUE ("Plaintiff"), by and through her attorneys, PHILLIPS &

ASSOCIATES, ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants, JP

MORGAN CHASE & CO. and JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

(collectively referred to as "Defendants" or "Chase"), upon information and belief, as follows:

### NATURE OF THE CASE

1.    Plaintiff brings this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, as amended,

      42 U.S.C. §§ 2000e et seq. ("Title VII"), the New York State Human Rights Law, New York

      State Executive Law §§ 296 et seq. ("NYSHRL"), and the New York City Human Rights

      Law, New York City Administrative Code §§ 8-107 et seq., ("NYCHRL"), and seeks

      damages to redress the injuries she has suffered as a result of being discriminated and

      retaliated against on the basis of her race (Asian), national origin (Indian), and sex/gender

      (female).

### JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

2.   Jurisdiction of this Court is proper under 42 U.S.C. §12101, et seq., and 28 U.S.C. §§ 1331 and 1343.

3.   The Court has supplemental jurisdiction over Plaintiff's State and City claims pursuant to 28 U.S.C. § 1367.

4.   Venue is proper in this district in that the events or omissions giving rise to the claims occurred within the Eastern District of New York. 28 U.S.C. § 1391(b).

5.   Plaintiff (a) filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 9, 2023 and by (b) receiving a Notice of Right to Sue from the EEOC on May 20, 2024, (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, and (d) contemporaneously with the filing of this Complaint, mailing copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as **"Exhibit A";** a copy of the transmittal letter to the NYCCHR *et ano*. is annexed hereto as **"Exhibit B."**

## PARTIES

6.   At all relevant times, Plaintiff was a resident of the State of New York, Kings County.

7.   JP Morgan Chase & Co. is a foreign business corporation licensed to do business in New York.

8.   JP Morgan Chase & Co. is the largest bank in the United States and operates consumer and commercial banking, asset and wealth management, and investment banking divisions.

9.   JP Morgan Chase & Co. is the parent company of JP Morgan Chase Bank, National Association.

10. JP Morgan Chase Bank, National Association is a foreign business association licensed to business in New York.

11. JP Morgan Chase Bank, National Association is a subsidiary of JP Morgan Chase & Co. that operates the North American commercial banking divisions.

12. JP Morgan Chase & Co. and JP Morgan Chase Bank, National Association are collectively referred to as Chase.

13. As of 2023, Chase has over 300,000 employees.

14. Chase is headquartered at 383 Madison Avenue, New York, NY 10017.

15. At all relevant times, Plaintiff was an employee of Chase and worked at the Brooklyn office located at 4 Metro Tech, Brooklyn, NY 11201.

## MATERIAL FACTS

### Plaintiff's Background

16. Plaintiff is an Asian woman of Indian descent.

17. Plaintiff is a successful executive with over two decades of experience working in risk management and analytics.

18. Plaintiff is a graduate of University of Albany where she obtained a Bachelor's in Business Administration, and in Finance and Marketing.

19. Prior to working for Chase, Plaintiff worked at Credit Suisse for over a decade where she was promoted to Head of Risk Analytics and Strategic Program Management Lead for the Americas.

20. At Credit Suisse, Plaintiff managed a team of fourteen and oversaw risk and capital calculations and reported detailed analyses for bank and trading books.

21. Plaintiff also worked as a Risk Manager for Citi Bank.

### Plaintiff Is A High Performing Employee At Chase

22.   On September 08, 2021, Plaintiff began working for Chase as Vice President, Credit Risk & Wholesale Analytics and earned $155,000 annually plus fringe benefits and bonuses.

23.   As a Vice President Credit Risk & Wholesale Analytics, Plaintiff's duties and responsibilities included, but were not limited to managing a team of two VPs and three analysts, analyzing the wholesale credit risk portfolio, producing analysis reports for the Board of Directors, giving quarterly presentations to the CFO, and providing guidance on strategy to senior management.

24.   In 2024, Plaintiff is projected to earn approximately $195,000 in total compensation, $175,000 of which consists of her base salary and $20,000, in incentive compensation.

25.   At all material times, Plaintiff was an exemplary employee with no disciplinary history and was well-qualified for her Vice President position.

26.   In her 2021 performance review, Chase effusively stated that Plaintiff delivered high-quality work and exhibited key leadership skills, including proactively working with her coworkers and learning new processes.

27.   In her 2022 performance review, Chase, again, provided Plaintiff a positive review, stating that she had become a trust partner to internal partners and stakeholders, met deliverable expectations, and developed a strong rapport with her teammates.

**Plaintiff Was Subjected To Racial, National Origin, and Gender-Based Discrimination and Subjected To A Hostile Work Environment.**

28.   Despite her exemplary performance, Plaintiff was discriminated against as an Indian woman, including by being excluded from workplace meetings, being overlooked for promotions, and paid less in performance bonuses vis-a-vis her white male subordinate.

29.   Plaintiff was the only Indian woman on her team. In fact, Plaintiff was the only woman on her team.

30. Plaintiff's supervisor was Gordon Hunt ("Hunt"), who held the title Executive Director and was a white male.

31. Hunt had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker(s) of the same.

32. Hunt harassed Plaintiff, treated her disparately and sought to impede her career as the only Indian woman on the team.

33. For instance, Hunt repeatedly told Plaintiff to call him "Boss" – a request he did not make of any males regardless of their race and/or national origin.

34. Hunt's request was to exert his power over her and to humiliate and demean her.

35. While Hunt harassed and discriminated against Plaintiff, he provided preferential treatment to the only white male on the team, Michael Calceglia ("Calceglia").

36. As an Associate Vice President ("AVP"), Calceglia was Plaintiff's subordinate and had only five years of experience prior to joining Chase, yet Hunt treated him as if he was a higher ranking than Plaintiff.

37. Hunt began grooming Calceglia for a Vice President position.

38. Hunt not only failed to assist Plaintiff in receiving a promotion, he also used Calceglia to harass and humiliate her, and ruin her career.

39. Also, almost immediately after Plaintiff began working at Chase, Hunt would consistently give credit for Plaintiff's work accomplishments to Calceglia.

40. On monthly calls with the New York, Delaware, and India teams regarding the Credit Risk Controllers' Risk Report for the CFO, Hunt would regularly give credit for Plaintiff's accomplishments to Calceglia.

41. Hunt's comments were damaging to Plaintiff's workplace reputation, as coworkers knew that she had completed these assignments but was being openly disrespected in meetings by

her supervisor.

42. Hunt did not pass off credit for males' (regardless of their race and/or national origin) work or accomplishments to others.

43. Hunt's mistreatment of Plaintiff adversely affected her reputation amongst her team and negatively affected her performance.

44. Plaintiff suffered a loss of self-confidence and self-esteem, as well as depression, as she was constantly sidelined and harassed at work.

45. Throughout 2021 and 2022, Plaintiff complained to Hunt about his mistreatment including regularly giving credit for her work to Calceglia.

46. Instead of addressing her complaints, Hunt initially brushed off Plaintiff's concerns.

47. When Plaintiff persisted in complaining of her mistreatment, Hunt exploded; his face became bright-red, and he would yell at her, causing her to be fearful.

48. Hunt also responded by talking to her in a demeaning manner as if she were a child.

49. Instead of rectifying or taking Plaintiff's complaints seriously, Hunt began taking steps to interfere and chill her from reporting him.

50. Hunt would try to dissuade her by telling her: "I understand how HR works," implying that HR was on his side and would not remediate her complaints.

51. Hunt would also try to intimidate Plaintiff by saying that his mother was the head of Human Resources at Goldman Sachs, implying that he had significant pull in the industry and could "blacklist" those who complained about him.

52. Hunt's comments were blatant threats to dissuade her from exercising her rights to complain about his discrimination – protected activity under law.

**Plaintiff Is Subjected To Retaliation After Complaining To HR**

53. Suffering from Hunt's conduct, both emotionally and professionally, Plaintiff was concerned

about reporting him further.

54. In or about early May 2022, Plaintiff took the first step to complain.

55. Plaintiff filled out an employee survey and complained that Hunt provided preferential treatment to Calceglia, the only white male member of the team.

56. Plaintiff also complained that Hunt gave credit for her work and accomplishments to Calceglia.

57. Dispute the survey promising confidentiality, and without speaking to Plaintiff, in June 2022, Chase informed Hunt that Plaintiff had complained that he was discriminating against her.

58. Thereafter, Hunt ramped up his harassment and retaliated against her.

59. Hunt began excluding Plaintiff from more business meetings.

60. Hunt diminished her authority further by bringing junior members onto her projects without her input or knowledge.

61. Hunt also threatened in a group meeting that if "someone had a problem with him," they shouldn't be writing anonymous survey complaints, blatantly calling Plaintiff out for reporting his misconduct.

62. Hunt's discussion of her "confidential" complaint to the larger group was inappropriate and threatening.

63. Hunt also threatened that he would retaliate against those who complained about him.

64. Hunt told Plaintiff privately that he previously had been the subject of an anonymous survey complaint filed by a non-White employee and that he did not want that employee on his team any longer, thus, he would "get him out" by giving him undesirable, difficult assignments, exclude him from group meetings, and interfere with his ability to provide deliverables.

65. Again, Hunt's comments were threats to dissuade Plaintiff from complaining of discrimination and tipping his hand about his discriminatory tactics.

66. HR did not approach Plaintiff about her survey complaints.

67. Seeing no other option, Plaintiff sought to elevate her complaints by complaining to Executive Director Ian Steinberg ("Steinberg"), who served as Hunt's supervisor.

68. Steinberg had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker(s) of the same.

69. Although Plaintiff complained to Steinberg on several occasions about being excluded, he failed to take corrective action to address the retaliation.

70. Instead, Steinberg became annoyed with Plaintiff and would gaslight her, by *inter alia* disputing that she had been excluded from workplace meetings.

71. As a result of Chase's retaliatory acts, Plaintiff was impeded from effectively performing her duties.

72. In or about Summer 2022, Plaintiff contracted COVID-19, and worked from home for a week.

73. Plaintiff also had a pre-planned vacation scheduled a few weeks later, in late Summer 2022.

74. Notably, Plaintiff's vacation was for only six days.

75. However, Hunt began to chastise Plaintiff for utilizing her PTO, claiming that Plaintiff was "on vacation the entire summer" as if Plaintiff utilizing her earned PTO was improper.

76. This caused Plaintiff to feel anxious about going on vacation, even though male (regardless of their race and/or national origin) employees were encouraged to utilize their PTO without issue.

77. In contrast, Plaintiff was chastised for allegedly being "on vacation all summer," in part, to humiliate Plaintiff for engaging in protected activity.

**Chase Asked Plaintiff To Complete An Assignment for Her White Male Subordinate**

78. In or about August 2022, Calceglia, too, began treating Plaintiff in a hostile, aggressive, and

insubordinate manner.

79.   Calceglia was encouraged to engage in harassment by Hunt's continued mistreatment of Plaintiff, and thus began subjecting her to a hostile work environment as well.

80.   During this time period, Hunt and Steinberg decide to assist Calceglia in getting promoted to a Vice President ("VP") role.

81.   In order to make sure Calceglia would be promoted, Hunt directed her to complete a project that he would then present to Managing Director Alison Tai See.

82.   Plaintiff was shocked and offended by the proposition.

83.   Plaintiff explained that she did not feel comfortable having her work passed off as having been completed by Calceglia.

84.   Additionally, Plaintiff complained that Calceglia was not performing at a VP level and was having behavior issues at work.

85.   Plaintiff explained that Calceglia treated coworkers and clients in a rude, unprofessional manner, and was overwhelmed with the workload to the point where he had several emotional breakdowns at work.

86.   Nevertheless, Hunt demanded that Plaintiff complete the assignment for Calceglia to present to Managing Director Tai See.

87.   After Plaintiff completed the bulk of the project, Hunt took over the few remaining tasks and presented it to the Managing Director.

88.   Again, Hunt did not direct any male Vice Presidents (regardless of their race and/or national origin) to complete another colleague's work and have that colleague pass it off as their own.

89.   In the following months, Calceglia continued to behave inappropriately in the workplace.

90.   On several occasions, Plaintiff provided Calceglia with appropriate feedback as his supervisor, in response, Calceglia would begin trembling before shouting at Plaintiff, turning

bright red, banging on his desk, and then storming out in a fury.

91. Plaintiff was embarrassed, as Calceglia's outbursts occurred in front of her other team members and her subordinate was openly flouting her authority.

92. As Calceglia is approximately six feet tall (approximately a foot taller than Plaintiff), Plaintiff felt frightened that he would attack her.

93. As such, Plaintiff met with Hunt and Steinberg about Calceglia's erratic, violent behavior.

94. Plaintiff told Hunt and Steinberg that Calceglia's behavior was scary and that she worried that he would attack her or another colleague.

95. Hunt brushed over her concerns, and instead shifted the conversation to whether Calceglia was ready to become a VP.

96. Plaintiff explained that based on his behavior, she did not think so.

97. In response, Hunt became furious with Plaintiff for bringing this to Steinberg's attention and began visibly shaking with fury.

98. Hunt then argued that Calceglia was ready to be VP and listed some of his alleged accomplishments in the workplace.

99. In response, Plaintiff told Hunt that some of Calceglia's "accomplishments" were assignments completed by Plaintiff. This further infuriated Hunt.

100. Shortly thereafter, Hunt asked Plaintiff to leave the room so Hunt and Steinberg could speak privately.

101. Despite the fact that Plaintiff supervised Calceglia and worked closely with him, Hunt continued to diminish her authority by refusing to allow her to provide feedback on her subordinate's performance.

102. Instead, Hunt and Steinberg specifically warned Plaintiff that she could not provide any negative comments on Calceglia's recommendation documents or performance reviews, lest

it impact his promotion chances.

103. Throughout the remainder of the year, Calceglia continued to behave in an aggressive, hostile, and offensive manner against Plaintiff, while Chase continued to ignore and condone his harassing behavior toward Plaintiff.

104. Despite Plaintiff's repeated complaints that Calceglia was not performing well, in or about January 2023, he was promoted to VP.

**Plaintiff's White Male Subordinate Received A Larger Bonus than Plaintiff**

105. On or about January 19, 2023, Chase issued company bonuses.

106. Plaintiff's supervisors did not discuss the team's performance, as they awarded Calceglia a disproportionately high bonus.

107. Later that day, Calceglia informed Plaintiff that he had received $29,000 in bonus compensation.

108. Calceglia's bonus was disproportionate, as he had less experience than Plaintiff and her non-White colleagues, yet he was provided a larger bonus than the other non-White employees on the team including the Team Leader, Plaintiff.

109. In fact, Calceglia had received a 45% larger bonus than Plaintiff, as she had only received a $20,000 bonus.

110. Furthermore, Calceglia's bonus was disproportionate, as the bonus should have been consistent with his salary in FY 2022 and his-then role as an Assistant VP.

111. Calceglia's disproportionate bonus was given to him in part due to his race and/or gender.

112. That same day, Plaintiff complained to Director Jodi Netch ("Jodi") that she was paid a lower bonus than Calceglia because of her race and gender, as well as her continued exclusion from the team.

113. Netch told Plaintiff that Chase was a "boy's club" and confirmed that Hunt discriminated

against other women against the company, including her subordinate Victoria.

114. Netch told Plaintiff that Hunt regularly would give credit for Victoria's work to her white male coworker Nick LNU.

115. Furthermore, Netch stated that Victoria received a lower performance bonus than her male counterparts, despite having greater job responsibilities.

116. Upon information and belief, Chase has a pattern and practice of underpaying female employees in comparison to their similarly situated white male counterparts.

117. Netch also informed Plaintiff that Hunt refused to cease his harassment of female employees.

118. On one occasion, Hunt asked Netch how he could raise morale in his department.

119. In response, Netch complained about his mistreatment of Plaintiff and how excluding her from meetings made her coworkers feel uncomfortable.

120. Netch told Hunt, in sum and substance: "As the champion of diversity, equity, and inclusion for our global team [given his leadership role in a DEI affinity group], you should know better than to discriminate against women and minorities."

121. Despite Netch's complaints, Hunt continued to treat Plaintiff and other female employees in a discriminatory fashion.

**Plaintiff Complained About Pay Disparities And The Continued Harassment**

122. On or about January 23, 2023, Plaintiff submitted an anonymous complaint against Hunt and Steinberg, alleging that they discriminated against women and minorities on the team, and that they paid her white male subordinate a larger bonus.

123. Approximately three months later, on March 22, 2023, an HR representative called Plaintiff in to discuss her complaint.

124. Plaintiff explained, *inter alia*, about Hunt's efforts to impede her career trajectory, his preferential treatment of Calceglia, as well as the disproportionate bonus Calceglia had

received.

125. Plaintiff complained that Hunt's harassment made it more difficult for her to perform her job functions, as she was isolated from her teammates and excluded from project communications and meetings.

126. Although the HR representative reassured Plaintiff that she would not be retaliated against, Hunt and Steinberg exacerbated their harassment by refusing to speak with her for weeks and by excluding Plaintiff from more meetings, projects, emails, and conference calls.

127. Furthermore, on the few occasions Plaintiff was present at meetings, Hunt would speak to her in a degrading and demeaning manner in front of participants.

128. Hunt would also feign a lack of understanding when Plaintiff would speak, asking, in sum and substance: "Do you *even* understand what I'm speaking about?" before chuckling.

129. On a few occasions, Hunt yelled at Plaintiff for non-issues such as her taking lunch, in order to continue to assert his dominance over her.

130. Due to Hunt's public humiliation, Plaintiff's subordinates ceased communicating with her on projects she led, as her managerial authority continued to be diminished.

131. Hunt did not talk down to male colleagues (regardless of their race and/or national origin) in a demeaning manner.

132. Hunt did not yell at male colleagues (regardless of their race and/or national origin) in the workplace.

133. The retaliation and hostile work environment took a toll on Plaintiff, as she fell into a deep depression, and experienced severe anxiety, panic attacks, loss of appetite, and social withdrawal.

134. Plaintiff experienced such severe emotional distress that she considered taking a medical leave of absence but did not as she feared further retaliation if she did.

135. In or about late April or early May 2023, Chase published "anonymous employee surveys" for employees to submit.

136. As such, tired and frustrated of the ongoing harassment, discrimination, and retaliation, Plaintiff submitted an anonymous employee survey, again, complaining that Hunt, with knowledge of Steinberg, was harassing, discriminating, and retaliating against female and/or minority employees and noted her continued exclusion from meetings and projects, unequal pay, and other degrading treatment.

137. On or about June 5, 2023, Plaintiff learned that during a department meeting, Managing Director Alison Tai See publicly disclosed Plaintiff's comments from the allegedly "anonymous employee survey."

138. Managing Director Tai See made no effort to protect Plaintiff's privacy, and following the meeting, several attendees, including Netch, reached out to Plaintiff to inform her that they were aware of her complaints of discrimination.

139. Her colleagues knew that the complaint was made by Plaintiff, as her complaint had identifying details such as her references to being the only woman on her team, that her team was led by two Caucasian males, and that she was being excluded from workplace meetings.

140. Tai See's public reading of Plaintiff's complaint was meant to further dissuade Plaintiff and her colleagues from complaining about the discriminatory work environment.

**Plaintiff Continues To Suffer Retaliation**

141. On or about June 7, 2023, at approximately 4:00 PM., Hunt ordered Plaintiff to complete a learning session and to present it to the entire department the following day at 10:00 AM, with a presentation, slides, and materials created and submitted by end of day.

142. Notably, the rest of Plaintiff's team had multiple weeks and even months' notice to prepare for the same type of presentations.

143. Furthermore, Hunt typically had multiple meetings with colleagues to prepare them for such presentations.

144. Nevertheless, in an act of retaliation, Hunt assigned Plaintiff the project at 4:00 PM, and expected a full presentation prepared by the end of day.

145. At all times prior, Hunt knew that English is Plaintiff's second language, which created difficulties in Plaintiff presenting to larger groups and that she needed additional time to prepare and practice due to the language barrier.

146. Hunt had given her male colleagues (regardless of their race and/or national origin) a reasonable time period (usually weeks or months) to prepare for presentations.

147. Hunt's actions were intended to sabotage Plaintiff's presentation.

**Hunt's Hostility And Harassment Escalates Further After She Complains**

148. Concurrently, Calceglia's behavior continued to escalate and worsen as he continued to be insubordinate and he began speaking to Plaintiff in an even more hostile, degrading, and offensive manner, with impunity.

149. On or about June 10, 2023, Plaintiff spoke with Hunt and complained of Calceglia's hostile and insubordinate behavior. Specifically, Plaintiff complained that Calceglia was frequently verbally attacking her.

150. As usual, Hunt ignored Plaintiff's complaints, and appeared angry at Plaintiff for complaining.

151. Plaintiff explained she planned on speaking with Calceglia regarding his hostile behavior and disrespectful attitude.

152. Plaintiff also noted that Calceglia seemed uneasy about his work as he did not understand the concepts behind the assignments.

153. Hunt began to scream at her: "Don't say that to [Calceglia], you are being a fucking dick!"

154. Plaintiff was frightened by her supervisor's sudden outburst and his use of vulgar language.

155. Plaintiff asked Hunt in sum and substance, "Why would you say things like that when I am very respectful to my team and treat them like my brothers?"

156. Plaintiff told Hunt that Calceglia lacked technological knowledge to understand the context of the projects.

157. Hunt, then, asked: "Do you even understand the work that Calceglia does?"

158. Plaintiff left the meeting feeling offended, dejected, and degraded.

159. Despite Plaintiff's repeated complaints, Chase has not remediated the hostile work environment and harassment that Plaintiff experienced.

160. In failing to address Hunt, Steinberg, and Calceglia's harassment, Chase has allowed her harassers to act with impunity.

**<u>Harm to Plaintiff</u>**

161. As a result, of Chase subjecting Plaintiff to a hostile work environment and discriminating against her, Plaintiff suffered severe emotional distress.

162. Plaintiff's suffering has included experiencing anger, depression, a loss of self-esteem, embarrassment, loss of confidence, irritability, anger, social withdrawal, and a strained relationship with her daughter.

163. Plaintiff also felt humiliated, offended, degraded, victimized, embarrassed, and depressed after being discriminated against.

164. As a result of Chase's discriminatory actions, Plaintiff's emotional distress continues.

165. As a result of the acts and conduct complained of herein, Plaintiff has also suffered, and will continue to suffer, loss of income, loss of a salary, bonuses, benefits, and other compensation which such employment entails.

166. Plaintiff has also suffered future pecuniary losses and emotional pain, suffering,

inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

167. Chase's conduct was intentional for the purpose of harming Plaintiff.

168. As a result of the above, Plaintiff has been damaged in the amount in excess of the jurisdiction of the Court.

169. Chase's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

170. As such, Plaintiff demands punitive damages.

**AS A FIRST CAUSE OF ACTION**
**DISCRIMINATION UNDER TITLE VII**

171. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

172. Plaintiff complains that Chase violated Title VII's prohibition against discrimination in employment based, in whole or in part, upon Plaintiff's race (Asian) and sex/gender (female.)

173. 42 U.S.C. § 2000e-2(a)(1), states in part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

174. Chase engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e-2(a)(1) by discriminating against Plaintiff because of her race (Asian), sex/gender (female), and/or national origin (Indian).

**AS A SECOND CAUSE OF ACTION**
**RETALIATION UNDER TITLE VII**

175. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

176. 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an

17

employer:

> [T]o . . . discriminate against any of his employees . . . because he has
> opposed any practice made an unlawful employment practice by this
> subchapter, or because he has made a charge, testified, assisted or
> participated in any manner in an investigation, proceeding, or hearing
> under this subchapter.

177. Chase retaliated against Plaintiff by impeding her career trajectory, excluding her from meetings, publicly humiliating her in front of her subordinates, and micromanaging her.

178. Chase would not have retaliated against Plaintiff but for Plaintiff's complaints about the hostile work environment, harassment, and discrimination.

179. Chase engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e-3(a) by retaliating against Plaintiff for complaining of the aforementioned violations.

**AS A THIRD CAUSE OF ACTION**
**DISCRIMINATION UNDER THE NYSHRL**

180.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

181.    New York State Executive Law § Executive Law § 296, 1) provides that: It shall be an unlawful discriminatory practice:

> (a) For an employer… because of an individual's **race..sex…** to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

> (h)For an employer… to subject any individual to harassment because of an individual's…. **race...national origin…sex….**or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, **regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims**. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or

18

privileges of employment because of the individual's membership in one or more of these protected categories…. **Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared.**

182.   Chase engaged in unlawful discriminatory practices by allowing a hostile work environment to persist, paying Plaintiff a lower bonus because of her race (Asian), national origin (Indian) and/or sex (female), and failing to address Plaintiff's complaints of race and sex discrimination.

## AS A FOURTH CAUSE OF ACTION
## RETALIATION UNDER THE NYSHRL

183.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

184.   New York State Executive Law § 296(1)(e) provides that, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

185.   Chase retaliated against Plaintiff by impeding her career trajectory, excluding her from meetings, publicly humiliating her in front of her subordinates, and micromanaging her.

186.   Chase would not have retaliated against Plaintiff but for Plaintiff's complaints about the hostile work environment, harassment, and pay disparity.

## AS AN FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NYCHRL

187.   Plaintiff repeats and realleges each and every allegation in the above paragraphs.

188.   New York City Administrative Code §8-107(1) provides that it shall be an unlawful discriminatory practice:

19

> For an employer or an employee or agent thereof, because of the actual or perceived age, **race**, creed, color, **national origin, gender,** disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment.

189.    Chase engaged in unlawful discriminatory practices by allowing a hostile work environment to persist, discriminating including by paying Plaintiff a lower bonus because of her race (Asian), national origin (Indian) and/or sex (female), and failing to address Plaintiff's complaints of race and sex discrimination.

### AS A SIXTH CAUSE OF ACTION
### FOR RETALIATION UNDER THE NYCHRL

190.    Plaintiff repeats and realleges each and every allegation in paragraphs one through one-hundred-fifty-eight.

191.    The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter…"

192.    Chase engaged in an unlawful discriminatory practice by retaliating against Plaintiff because of her opposition to the unlawful employment practices of Chase.

### JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII, the NYSHRL, and the NYCHRL in that Defendants discriminated against Plaintiff on the basis of her race (Asian), national origin (Indian) and sex/gender (female), paid her

disproportionately lower bonus than her white male counterpart, and retaliated against her for engaging in protected activities;

B.      Awarding damages to Plaintiff for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiff's reputation in an amount to be proven;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action, and pre-judgment and post-judgment interest; and

F.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

Dated:  New York, New York
        August 16, 2024

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By:     _____

Michelle A. Caiola, Esq.
Jonathan Goldhirsch, Esq.
*Attorneys for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
T: (212) 248-7431
F: (212) 901 - 2107
MCaiola@tpglaws.com
Jgoldhirsch@tpglaws.com

21